UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD

LAUREN MCLAUGHLIN,
                    Appellant,

          v.

OFFICE OF PERSONNEL
    MANAGEMENT,
                    Agency.

DOCKET NUMBER
PH-844E-20-0282-I-1

DATE: February 27, 2023

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Leah Bachmeyer Kille, Esquire, Lexington, Kentucky, for the appellant.

Moraima Alvarez, Washington, D.C., for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

**FINAL ORDER**

¶1      The appellant has filed a petition for review of the initial decision, which affirmed the reconsideration decision of the Office of Personnel Management (OPM) denying her application for disability retirement under the Federal Employees' Retirement System (FERS). For the reasons discussed below, we

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

GRANT the appellant's petition for review and REVERSE the initial decision and OPM's reconsideration decision.

## BACKGROUND

¶2     The appellant served as a Consumer Safety Officer with the Food and Drug Administration (FDA) from March 24, 2002, until she resigned effective May 7, 2018. Initial Appeal File (IAF), Tab 4 at 77, 100, 102. In this position, she inspected, investigated, and collected samples of commodities that go "on or in [the human] body." IAF, Tab 20, Hearing Recording (HR) at 3:05 (testimony of the appellant). Her position required "quite a bit of travel. . . . Probably a 2 hour drive . . . each way" on a typical day. HR at 4:50 (testimony of the appellant). On May 6, 2019, she applied for disability retirement under FERS based on the following conditions: post-traumatic stress disorder (PTSD), major depressive disorder, segmental myoclonus, cervicalgia, and regional myoclonic jerks. IAF, Tab 4 at 55-56, 79-81, 83-86.

¶3     Since 1987, the appellant has suffered from depression "on and off over the years." IAF, Tab 15 at 37; HR at 59:50 (testimony of the appellant). Her PTSD began in 1988. IAF, Tab 15 at 37; HR at 59:50 (testimony of the appellant). In 2008, she was diagnosed with segmental myoclonus caused by carbon monoxide poisoning, resulting in regional myoclonic jerks, back and neck pain (cervicalgia), and fatigue. HR at 19:00 (testimony of the appellant); IAF, Tab 4 at 80, Tab 15 at 19-20. Myoclonus is a condition that causes sudden muscular contractions, "generally due to a central nervous system lesion." Myoclonus, Stedman's Medical Dictionary 584030, accessed via westlaw.com (last visited Feb. 27, 2023). According to the appellant, her medical conditions prevented her from performing various duties of her position, including driving. HR at 29:00 (testimony of the appellant).

¶4     OPM issued a reconsideration decision, denying the appellant's application for disability retirement. IAF, Tab 4 at 5-8. The appellant appealed OPM's

reconsideration decision to the Board and requested a hearing. IAF, Tab 1. After holding a telephonic hearing, the administrative judge issued an initial decision that affirmed OPM's decision. IAF, Tab 17 at 4, Tab 22, Initial Decision (ID) at 1, 12-13. She reasoned that the appellant did not show that her segmental myoclonus caused a service deficiency in performance, conduct, or attendance. ID at 4-12. She also appears to have determined that the appellant did not show that the agency could not reasonably accommodate her myoclonus. ID at 9-10. She did not make a finding as to the whether the appellant's PTSD and depression were disabling. ID at 12-13.

¶5      The appellant has filed a petition for review. Petition for Review (PFR) File, Tab 1. OPM has filed a response. PFR File, Tab 3. The appellant has filed a reply to OPM's response and a motion to submit additional evidence.[2] PFR File, Tab 4.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶6      In an appeal from an OPM decision on a voluntary disability retirement application, the appellant bears the burden of proof by preponderant evidence. *Thorne v. Office of Personnel Management*, 105 M.S.P.R. 171, ¶ 5 (2007);

---

[2] The appellant moves to introduce documents from September 2010 through August 2012 relating to her medical conditions and restrictions. PFR File, Tab 4 at 6-7, 9-25. She argues that these documents were unavailable at the close of record because "they were archived in a retired and inactive email address" and that she only realized the importance of these documents after the initial decision and the agency's response to her petition for review made it clear that the administrative judge and agency gave little weight to her hearing testimony. PFR File, Tab 4 at 7. Under 5 C.F.R. § 1201.115, the Board generally will not consider evidence submitted for the first time with a petition for review absent a showing that it was unavailable before the record was closed before the administrative judge despite the party's due diligence. *Avansino v. U.S. Postal Service*, 3 M.S.P.R. 211, 213-14 (1980). An appellant's failure, as here, to realize the need for more complete documentation is a lack of due diligence. *Black v. Department of the Treasury*, 26 M.S.P.R. 529, 530-31 (1985). The appellant has not provided any explanation as to why she could not attempt to log onto this email account prior to the close of record. Therefore, we deny the appellant's motion to submit new evidence, and we decline to consider those documents here.

5 C.F.R. § 1201.56(b)(2)(ii).  To be eligible for a disability retirement annuity under FERS, an employee must show the following:  (1) she completed at least 18 months of creditable civilian service; (2) while employed in a position subject to FERS, she became disabled because of a medical condition, resulting in a deficiency in performance, conduct, or attendance, or, if there is no such deficiency, the disabling medical condition is incompatible with either useful and efficient service or retention in the position; (3) the condition is expected to continue for at least 1 year from the date that the application for disability retirement benefits was filed; (4) accommodation of the disabling medical condition in the position held must be unreasonable; and (5) she did not decline a reasonable offer of reassignment to a vacant position.  5 U.S.C. § 8451(a); *Thorne*, 105 M.S.P.R. 171, ¶ 5; 5 C.F.R. § 844.103(a).

¶7        The administrative judge found, and the parties do not dispute on review, that the appellant met the 18-month service requirement under FERS at the time she filed her application and did not decline a reasonable offer of reassignment to a vacant position.  ID at 4, 9-10; IAF, Tab 4 at 60-61, 97-100, 102, Tab 14 at 4-5, Tab 15 at 24; HR at 34:00, 43:00 (testimony of the appellant).  Thus, the appellant's entitlement to a disability retirement annuity depends on whether she had a disabling medical condition that was expected to last for at least 1 year from May 2019 and whether accommodating that condition was unreasonable. *Thorne*, 105 M.S.P.R. 171, ¶ 5.

The administrative judge erred in finding that there was insufficient evidence that the appellant's medical conditions prevented her from rendering useful and efficient service.

¶8        There are two ways to meet the statutory requirement that the employee "be unable, because of disease or injury, to render useful and efficient service in the employee's position."  *Henderson v. Office of Personnel Management*, 117 M.S.P.R. 313, ¶¶ 16 (2012); *Jackson v. Office of Personnel Management*, 118 M.S.P.R. 6, ¶¶ 6-7 (2012) (applying *Henderson* to FERS cases).  First, an

appellant can establish that the medical condition caused a deficiency in performance, attendance, or conduct, as evidenced by the effect of her medical condition on her ability to perform specific work requirements, or that her medical condition prevented her from being regular in attendance or caused her to act inappropriately. *Rucker v. Office of Personnel Management*, 117 M.S.P.R. 669, ¶ 10 (2012); *Henderson*, 117 M.S.P.R. 313, ¶ 17. Alternatively, the employee can show that her medical condition is inconsistent with working in general, in a particular line of work, or in a particular type of work setting. *Rucker*, 117 M.S.P.R. 669, ¶ 10; *Henderson*, 117 M.S.P.R. 313, ¶ 17.

¶9    In her initial decision, the administrative judge found insufficient evidence to show that the appellant's segmental myoclonus prevented her from rendering useful and efficient service. ID at 4-13. The appellant disputes this finding. PFR File, Tab 1 at 5-10. We agree with the appellant and conclude that she proved that her myoclonus, combined with her mental health conditions, caused a deficiency in performance, as evidenced by the effect of her medical conditions on her ability to perform the driving requirements of her position.

*The appellant established that her position required extensive driving*.

¶10    An appellant's inability to perform the extensive driving requirements of her position can render her disabled from rendering useful and efficient service.[3] *See Wommack v. Office of Personnel Management*, 8 M.S.P.R. 218, 220-22 (1981) (finding the evidence sufficient to support the appellant's contention that he was disabled based on a medical condition that rendered him unable to fulfill the extensive driving requirements of his position). The appellant testified without contradiction that her position "require[d] at least 50% travel." HR

---

[3] To the extent that the appellant also had difficulty driving to and from work, we do not consider those limitations here. IAF, Tab 4 at 30. Difficulty in commuting is not a relevant consideration in a disability retirement determination. *Jolliffe v. Office of Personnel Management*, 23 M.S.P.R. 188, 191 (1984), *aff'd*, 785 F.2d 320 (Fed. Cir. 1985) (Table).

at 29:20 (testimony of the appellant). She added that typical driving during the work day was "about 2 hours each way." HR at 5:10 & 28:00 (testimony of the appellant). This testimony was corroborated by her position description, which specified that approximately 50% of her duties involved travel in order to conduct inspections and investigations. IAF, Tab 5 at 4-9. The administrative judge appears to have found that driving was a requirement of the appellant's position, and we agree. ID at 11-12.

*The administrative judge erred in discounting the appellant's medical evidence.*

¶11    The administrative judge appeared to find that the appellant failed to provide sufficient medical evidence to support her claim that she was unable to perform the duties of her position. ID at 4-12. The appellant argues that she met her burden to prove that she was medically unable to drive. PFR File, Tab 1 at 6-8, 9-10, 12-13. We agree with the appellant.[4]

¶12    In her initial decision, the administrative judge applied a "general" rule that medical evidence must show how the employee's conditions affect her ability to perform specific job duties and requirements, and she determined that the appellant's medical evidence failed to make this showing. ID at 4, 6, 8. For example, she found that the medical opinion of the appellant's treating neurologist did not support the appellant's disability retirement application because he did not "address[] . . . the impact of the appellant's condition on her specific work requirements," and "he had not reviewed the [appellant's] position description" or materials related to her disability retirement application. ID at 8. In finding the neurologist's opinion deficient, the administrative judge cited to the Board's decision in *Henderson*, 117 M.S.P.R. 313, ¶¶ 12, 14. ID at 4.

---

[4] Because, as discussed below, we find the appellant met her burden to prove eligibility for a disability retirement annuity based on her driving restriction, we do not reach the issue of whether, as she argues on review, her medical conditions also caused deficiencies in her attendance and conduct. PFR File, Tab 1 at 5-8.

¶13    In fact, the *Henderson* decision rejected this approach.  In *Henderson*, the Board overruled the line of cases that indicated there was a "general" rule that an appellant's entitlement to a disability retirement is conditioned on her providing evidence from a medical provider explaining specifically how her medical conditions affected specific work requirements.  *Henderson*, 117 M.S.P.R. 313, ¶¶ 17-18.

¶14    The administrative judge also appears to have found the appellant's neurologist's notes insufficient because they reiterated what the appellant said to him during their sessions and did not state that the appellant was medically impaired.  ID at 6-9.  This determination was also in error.  Although objective medical evidence must be considered, such evidence is not required to establish disability.  *Doe v. Office of Personnel Management*, 109 M.S.P.R. 86, ¶ 10 (2008) (citing *Vanieken-Ryals v. Office of Personnel Management*, 508 F.3d 1034, 1040-44 (Fed. Cir. 2007)).  As stated by the U.S. Court of Appeals for the Federal Circuit, "an applicant may prevail based on medical evidence that . . . consists of a medical professional's conclusive diagnosis, even if based primarily on his/her analysis of the applicant's own descriptions of symptoms and other indicia of disability."  *Vanieken-Ryals*, 508 F.3d at 1041.

¶15    Similarly, the administrative judge erred in disregarding the appellant's documentation from the healthcare providers who treated her PTSD and depression.  ID at 7, 10-11.  At one point, the administrative judge suggested that this documentation was not relevant because these healthcare providers did not treat the appellant's myoclonus.  ID at 7-8.  However, the conditions based upon which the appellant sought a disability retirement annuity included not only myoclonus, but also PTSD and depression.  IAF, Tab 4 at 80.  The requisite showing of medical disability may be made based on the existence of a combination of medical conditions.  *Hunt v. Office of Personnel Management*, 105 M.S.P.R. 264, ¶ 35 (2007).  Further, it is appropriate to rely on the causal or exacerbating effect of various medical conditions on one another.  *Id.*  Thus, the

appellant's medical evidence related to her mental health conditions is relevant in this appeal.

¶16        Further, to the extent that the administrative judge indicated that the medical documentation related to the appellant's mental health should be discounted because her conditions arose out of "her traumatic experiences and relationship and financial difficulties," we are not persuaded. ID at 7, 10-11. The cause of a condition is not relevant in determining whether an applicant is eligible for disability retirement. *Marucci v. Office of Personnel Management*, 89 M.S.P.R. 442, ¶ 9 (2001). Thus, we cannot agree with the administrative judge that this medical documentation does not warrant serious consideration.

¶17        Finally, the administrative judge erred in giving little to no weight to the appellant's medical evidence of her mental health conditions because the notes from her mental health providers began when the appellant was still employed, but no longer reporting to work, and continued after her resignation. ID at 7, 10-11. The appellant need only establish that she became disabled while employed in a position subject to FERS. 5 C.F.R. § 844.103(a)(2) (providing, as relevant here, that to be eligible for a FERS disability retirement annuity, the applicant "must, while employed in a position subject to FERS, have become disabled because of a medical condition, resulting in a deficiency in performance, conduct, or attendance"). The appellant's absence from work does not indicate a lack of disability, and indeed a deficiency in attendance may be a basis for finding an employee has a disabling condition. *Id.* Thus, the appellant's medical evidence dating from after she began a period of extended leave is relevant here.

¶18        Further, as to medical evidence dating after her resignation, post-separation medical evidence can be probative of whether the appellant became disabled while serving in a FERS position when "proximity in time, lay testimony, or some other evidence provides the requisite link to the relevant period." *Reilly v. Office of Personnel Management*, 571 F.3d 1372, 1382 (Fed. Cir. 2009). We have considered the appellant's post-resignation medical evidence here because she

provided testimony linking her worsening mental conditions and myoclonus to the period of time when she resigned. HR at 12:20, 27:00, 29:20, 32:00 & 47:00 (testimony of the appellant).

*The appellant established that her medical conditions caused her to be unable to perform the driving requirements of her position.*

¶19    The Board will consider all pertinent evidence in determining an appellant's entitlement to disability retirement:  objective clinical findings, diagnoses and medical opinions, subjective evidence of pain and disability, and evidence relating to the effect of the applicant's condition on her ability to perform the duties of her position. *Henderson*, [117 M.S.P.R. 313](#), ¶ 19.  Nothing in the law mandates that a single provider tie all of this evidence together. *Id.*  For example, if the medical provider sets forth clinical findings, a diagnosis, and a description of how the medical condition affects the appellant's activities in general terms, the Board could consider that evidence, together with the appellant's subjective account of how the condition has affected her ability to do her job and her daily life, testimony or statements from supervisors, coworkers, family members, and friends, and the appellant's position description. *Id.*

¶20    Here, the appellant testified that her myoclonic jerks caused her to have two car accidents, one in her personal vehicle in 2010, when her arm jerked and she drove into a pole, and one in a Government vehicle on an unspecified date in 2017, when she "dragged a car through a fence gate and took out the whole left side of the vehicle."  HR at 12:20 & 32:00 (testimony of the appellant).  The second accident led her to conclude that she could no longer drive. *Id.* at 12:20 (testimony of the appellant).  She explained, "as the stress . . . increased, my symptoms were increasing . . . and it became a vicious cycle—with my symptoms exacerbating, stressing about driving." *Id.* at 27:00 (testimony of the appellant).  She testified that as a result, she was unable to perform the driving requirement of her job stating, "I was sick . . . I was really struggling, the commute, and drive and to not crash a car and I was under a lot of stress" and

"traveling is my difficulty. I can't drive, I don't drive, and I won't drive." *Id.* at 29:20 (testimony of the appellant). She also testified that her job requires a high level of concentration and that she "had difficulty thinking straight and staying focused" because of medication she was taking for her depression. *Id.* at 47:00 (testimony of the appellant). On the Agency Certification of Reassignment and Accommodation Efforts completed by the appellant's supervisor in connection with her disability retirement application, he observed, in essence, that the appellant's medical conditions prevented her from "perform[ing] the functions of her job as described in her position description." IAF, Tab 18 at 34, 36. Similarly, the Supervisor's Statement he completed reflected his assessment that her performance was less than fully successful. *Id.* at 47-48. Eventually, in November 2017, the appellant stopped reporting to work for medical reasons and was on leave without pay through her resignation. *Id.* at 46; HR at 49:00 (testimony of the appellant).

¶21 Consistent with the appellant's testimony, both the appellant's mental healthcare providers and her neurologist indicated that her mental health conditions exacerbated her myoclonus, and vice versa, to the point where she was no longer able to perform her job functions. For instance, in January 2018, the appellant's treating licensed clinical social worker (LCSW) completed a Family and Medical Leave Act of 1993 certification form stating that the appellant should take extended leave from January 23, 2018, through January 23, 2019. IAF, Tab 15 at 32-35. The LCSW explained that the appellant "displays tics, tremors, spasms and seizures which cause embarrassment, shame, inadequacy, and worthlessness," which in turn "cause[] her to have daily panic attacks and severe anxiety which interrupts daily functioning." *Id.* at 33-34.

¶22 The appellant's neurologist, who has treated her since at least 2012, also corroborated her testimony. His January 17, 2018 notes reflect that, "starting in October or November [the appellant] had a re-exacerbation of her depression and she [has] undergone a number of different medication changes." IAF, Tab 4

at 30. He stated that her myoclonus "had been under control" with the medication Lamictal "but unfortunately as her mood disorder worsened so to[o] did her segmental myoclonus. . . . [S]he has been out of work since late November 2017 and believes that she will be unable to return to work in the capacity that she had been secondary to her [myo]clonus and mood disorder."[5] *Id.* His notes reflected that the medications she was taking for her conditions negatively affected her judgment and driving. *Id.* Shortly thereafter, in February 2018, he recommended that the appellant work from home "due to limitations on driving for long periods of time." IAF, Tab 15 at 25. After the appellant resigned, her neurologist expressed his belief that she stopped working because her work environment caused stress, which in turn exacerbated her myoclonus "such that [she] could not perform her job." *Id*. at 21-23.

¶23    As discussed above, the administrative judge appears to have found the appellant's medical evidence to be lacking. We do not agree. In assessing the probative weight of medical opinion, the Board considers whether the opinion was based on a medical examination, whether the opinion provided a reasoned explanation for its findings as distinct from mere conclusory assertions, the qualifications of the expert rendering the opinion, and the extent and duration of the expert's familiarity with the appellant's treatment. *Wren v. Department of the Army*, 121 M.S.P.R. 28, ¶ 9 (2014). Here, the appellant provided medical documentation from her treating neurologist and LCSWs. She had a longstanding treatment relationship with her neurologist, beginning in 2012. IAF, Tab 15 at 19. Her neurologist's stationery identified him as a medical doctor with a board certification in neurology and a Ph.D., and we have no reason to question those qualifications. *Id.* at 25.

---

[5] He referred to this anti-seizure medication by its generic name, lamotrigine. *See* https://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/drg-20067449 (last visited Feb. 27, 2023). For the sake of clarity and consistency, we will refer to it in this decision by the brand name Lamictal.

¶24      The appellant began treatment at the clinic that was the source of her mental health documentation in December 2017. *Id.* at 33, 37. She received counseling from a particular LCSW at that clinic beginning as early as July 2018. *Id.* at 37, 46. Thus, the clinic and LCSW's familiarity with the appellant began months prior to her May 2019 application for disability retirement. IAF, Tab 4 at 55-56, 79-81, 83-86. While we have less information about the qualifications of the appellant's treating LCSW, we have no reason to doubt that she was qualified to treat depression and PTSD.

¶25      The medical notes, discussed above, are specific, discuss relevant medical factors, and are not contradicted. *See Confer v. Office of Personnel Management*, 111 M.S.P.R. 419, ¶ 20 (2009) (indicating that these factors, as well as others, are considerations in determining the probative value of medical evidence). Thus, we find that the opinion of the appellant's healthcare providers is entitled to significant probative weight and that, based on this evidence in combination with the appellant's testimony and her supervisor's statements, she established that her medical conditions caused her to be unable to perform the driving requirements of her position. ID at 6, 8.

*The evidence does not support the administrative judge's conclusion that the appellant refused to take medication that controlled her myoclonus.*

¶26      The administrative judge also appeared to find that the appellant's myoclonus became disabling as a result of the appellant's refusal to take Lamictal, against the advice of her neurologist. ID at 8-9. The appellant challenges this finding on review, arguing that she stopped taking the Lamictal after it stopped working effectively. PFR File, Tab 1 at 11. She argues that her neurologist approved of this change in medication. *Id.* at 11-12.

¶27      A voluntary refusal to accept facially reasonable treatment can bar entitlement to disability retirement benefits. *Frontan v. Office of Personnel Management*, 90 M.S.P.R. 427, ¶ 8 (2001). However, the Board has held that an appellant need not take medications that do not enable her, with or without

accommodation, to perform the duties of her position. *Doe*, [109 M.S.P.R. 86](#), ¶ 20. For example, the has Board found that an appellant established entitlement to disability retirement when both she and her doctor testified that prescribed medications did not control her PTSD. *Id.* Similarly, the Board has accepted appellants' arguments that side effects prevented them from taking their prescribed medication, and the Board has not denied disability retirement when drugs are no longer taken for this reason. *Confer*, [111 M.S.P.R. 419](#), ¶¶ 23-24. Thus, the has Board found insufficient evidence that an appellant refused to follow treatment recommendations when she alleged that she stopped taking two different medications for depression because one caused nausea and the other caused dizziness. *Id.*

¶28    Initially, Lamictal helped to control the appellant's myoclonic jerks. HR at 13:30 (testimony of the appellant); IAF, Tab 4 at 28, Tab 5 at 127-28. However, according to the appellant, despite this medication, she began to have "break-through tics" or jerks in 2017. HR at 14:30 (testimony of the appellant). She indicated that one such incident caused her to have her 2017 accident in a Government-owned vehicle. HR at 12:20 & 32 (testimony of the appellant). It was at that time that she determined she could no longer drive. *Id.*; IAF, Tab 4 at 80. In her disability retirement application, she stated that she became disabled from her position in October 2017, and she testified that she last reported to work in November 2017. IAF, Tab 4 at 79; HR at 49:00 (testimony of the appellant).

¶29    In November 2017, the appellant advised her neurologist that she had reduced her Lamictal. IAF, Tab 4 at 28. Although initially her neurologist stated that the appellant's myoclonus reemerged around November 2017 because she cut back on her Lamictal in January 2018, he stated that it was her worsening mood disorder that caused her myoclonus to worsen. IAF, Tab 4 at 30, Tab 15 at 26. We have considered this conflicting explanation, but we find that the appellant has established by a preponderance of the evidence that she did not refuse to follow treatment recommendations.

¶30     First, the appellant testified that she stopped taking the medication in January 2018 because, in addition to no longer preventing her myoclonic jerks, it was difficult to take and caused stomach pain.  HR at 14:16 & 1:20:00 (testimony of the appellant).  She also testified that her neurologist was on board with her decision to stop taking Lamictal.  *Id.* at 14:16 (testimony of the appellant).  Consistent with that testimony, at the time of her resignation in May 2018, the appellant's neurologist stopped recommending Lamictal and prescribed her only clonazepam on an as-needed basis for her myoclonus.  IAF, Tab 4 at 32-33.  In September 2020, her neurologist confirmed via interrogatories that the appellant has been compliant with reasonably prescribed medical treatment.  IAF, Tab 15 at 23.  Thus, under the circumstances of this case, we find that the evidence does not show that the appellant refused to follow treatment recommendations.  Even if she had, we would find that her uncontroverted explanation that the Lamictal became less effective and caused stomach pain is a legitimate basis for stopping the medication.

*The appellant's medical condition was not situational or confined to a single work environment.*

¶31     OPM argues that the appellant's depression and anxiety were situational based on "troubles at work stemming from the Weintgarten [sic] Investigation, reprimands and leave restriction."  PFR File, Tab 3 at 6.  Among OPM's prehearing exhibits is a November 1, 2017 Memorandum of Weingarten Investigative Interview regarding the appellant's alleged unauthorized use of a Government-owned vehicle on August 24, 2017, and her failure to account for her whereabouts on August 30, 2017.  IAF, Tab 18 at 12-14.  There was no testimony during the hearing explaining the relevance of this memorandum, nor did the administrative judge discuss it in her initial decision.  HR; ID.

¶32     The Board has rejected disability claims when the appellant's conditions were largely situational, i.e., apparent only in her work environment or in the context of what she perceives as a hostile work environment.  *Luzi v. Office of*

*Personnel Management*, 109 M.S.P.R. 79, ¶ 9 (2008); *Cosby v. Office of Personnel Management*, 106 M.S.P.R. 487, ¶¶ 7, 10 (2007). However, the Board has distinguished such circumstances from ones in which job-related stress precipitated and exacerbated an appellant's condition, which was itself disabling. *Doe*, 109 M.S.P.R. 86, ¶ 18; *Thorne*, 105 M.S.P.R. 171, ¶ 15. The Board has repeatedly held that job-related stress resulting in physical or mental impairments that prevent an employee from performing the duties required in her position can warrant the granting of disability retirement. *Doe*, 109 M.S.P.R. 86, ¶ 18; *Thorne*, 105 M.S.P.R. 171, ¶ 15; *Kimble v. Office of Personnel Management*, 102 M.S.P.R. 604, ¶ 14 (2006).

¶33    Here, the medical evidence and testimony do not support a finding that the appellant's segmental myoclonus and depression were a reaction to her particular workplace, "troubles" from the Weingarten investigation, or attendance-related reprimands and leave restriction. Rather, these conditions were apparent outside of the specific work environment at the FDA. The record shows that the appellant was suffering from worsening depression since 2012 and, according to December 2017 notes from a treating LCSW, "ha[d] been isolating herself for . . . years to the point where she [was] in danger of losing her job." IAF, Tab 15 at 37. The appellant suffered from depression both before and after her resignation, causing her to isolate herself, "not leav[e] her bed or home for days," and not shower or otherwise care for herself. *Id.* at 46-77, 84. The appellant similarly testified that she continues to suffer from her mental health conditions, despite complying with treatment and incorporating changes to diet and exercise. HR at 35:00 (testimony of the appellant). The appellant also testified that her myoclonus is permanent, she has not driven since 2018, and she no longer has a valid driver's license due to her myoclonic jerks. *Id.* at 12:20, 35:00 (testimony

of the appellant). Thus, we do not find that her depression and anxiety were situational.[6]

¶34 Similarly, to the extent OPM is arguing that the appellant did not resign until she was at risk of discipline, thereby detracting from her claims of disability, we are not persuaded. The Board has held that an appellant's application for disability retirement in the face of an impending removal for misconduct may cast doubt on the veracity of her application. *Henderson v. Office of Personnel Management,* 109 M.S.P.R. 529, ¶¶ 2-3, 9, 21 (2008) (finding that the appellant established an entitlement of disability retirement despite the suspicious timing of his application, which occurred after he was indefinitely suspended pending the outcome of a criminal charge of marijuana distribution).

¶35 The investigative interview into the appellant's alleged unauthorized use of a Government vehicle and unexplained unavailability occurred in November 2017, the same month she began a period of extended leave that ended with her May 2018 resignation. IAF, Tab 4 at 102, Tab 18 at 12-14; HR at 49:00 (testimony of the appellant). The fact that less than 1 month passed between the appellant being accused of misconduct and her initiating a lengthy absence ending

---

[6] In its response to the petition for review, OPM also alleges that the appellant "has a history of alcohol abuse, that apparently . . . had a flare up during her performance and attendance issues at work." PFR File, Tab 3 at 6. The administrative judge noted "the appellant's history of overusing alcohol" in her decision. ID at 7. However, there is nothing in the record to support OPM's allegation that the appellant's alcohol use caused her performance and attendance issues. Moreover, as previously discussed, the appellant has established that her conditions prevented her from performing the driving requirements of her position. The Board will only consider medical conditions listed in the appellant's disability retirement application. *Ballenger v. Office of Personnel Management*, 101 M.S.P.R. 138, ¶¶ 12-13 (2006) (clarifying that the Board may not consider evidence relating to a medical condition that was never the subject of the disability retirement application in question). Further, we decline to find that addiction alone necessarily disqualifies an appellant from disability retirement based on other medical conditions. *See Bemiller v. Office of Personnel Management*, 119 M.S.P.R. 653, ¶¶ 2, 8-16 (2013) (finding an appellant eligible for disability retirement based on her fibromyalgia and chronic pain despite her prior dependency on Oxycodone and Oxycontin).

in resignation casts some doubt on whether she stopped working for medical reasons or to avoid potential discipline for her alleged serious misconduct. *Dias v. Department of Veterans Affairs*, 102 M.S.P.R. 53, ¶ 16 (2006) (describing absence without leave as a serious offense), *aff'd per curiam*, 223 F. App'x 986 (Fed. Cir. 2007); *Garcia v. Department of the Air Force*, 34 M.S.P.R. 539, 540-42 (1987) (finding that an administrative judge improperly mitigated the penalty of removal for two instances of willful unauthorized use of a Government-owned vehicle). However, we find that the fact that she did not apply for a disability retirement annuity until a year after her resignation, combined with the medical evidence and her subjective reports of the effect of her myoclonus and depression on her ability to drive, outweighs any such doubt. IAF, Tab 4 at 55-56, 79-81, 83-86; *see Henderson*, 109 M.S.P.R. 529, ¶ 21 (determining that although the timing of an appellant's disability retirement application was suspect, he presented overwhelming medical evidence that corroborated his subjective complaints and established that his medical condition was incompatible with either useful and efficient service or retention in his former position).

¶36    Lastly, on review, the appellant challenges the administrative judge's implicit finding that the appellant's conditions are not disabling because, in April 2019, she took a 3-day consulting job in India inspecting the manufacturing process of meclizine and because she sells Christmas trees. ID at 12.

¶37    Subsequent work history is relevant to whether an individual's condition is confined to a single work environment. *Confer*, 111 M.S.P.R. 419, ¶ 16. One is not entitled to a disability retirement annuity when one's medical condition is based on a single work environment, e.g., because it grew out of a personal conflict with a supervisor or resulted from a perceived hostile work environment due to workload or understaffing. *Id*. However, an appellant is not required to show that her disability rendered her incapable of working all positions. *Angel v. Office of Personnel Management*, 122 M.S.P.R. 424, ¶ 14 (2015). The relevant position for determining the appellant's qualification for disability retirement

benefits is the position she last held before filing her application. *Id.* Here, the appellant testified that although the consulting job involved similar responsibilities, it was less demanding and involved less pressure and scrutiny than her Consumer Safety Officer position with the FDA because she worked from a checklist, which the FDA does not use or provide to Consumer Safety Officers. HR at 51:30 and 1:10:00 (testimony of the appellant); PFR File, Tab 1 at 12-13. She also stated that observation work in the consulting job was less intense because people were not as nervous to see a consultant as they were to see an FDA Consumer Safety Officer. HR at 1:10:00 (testimony of the appellant). Most importantly, the consulting job did not require her to drive because she flew to India and had an assigned driver while there. *Id.*

¶38    With regard to the Christmas tree farm, the administrative judge relied on a December 2017 assessment completed by one of the appellant's treating LCSWs, stating, "she lives on a farm and does sell Christmas trees," and the fact that the appellant's email address for the appeal contained the name of the farm, to implicitly find that she was not disabled from working. ID at 12; IAF, Tab 1 at 1, Tab 15 at 43. However, there is nothing in the record regarding the appellant's alleged involvement with this business and, on review, the appellant clarifies without contradiction that her fiancé handles that business. PFR File, Tab 1 at 13. Therefore, we find that the appellant's employment after her resignation does not undermine the evidence that she was unable to work in her Consumer Safety Officer position.

The appellant met her burden to prove that her conditions were expected to last for at least 1 year from her May 2019 application for a disability retirement annuity.

¶39    The administrative judge did not make a determination as to whether the appellant met her burden to prove that her medical conditions were expected to last for at least 1 year from her application for disability retirement. The parties

also do not address this issue on review. As discussed above, this is an element of her burden. *Thorne*, [105 M.S.P.R. 171](#), ¶ 5.

¶40  Here, the appellant testified that her myoclonus is permanent, she has not driven since 2018, and she no longer has a valid driver's license due to her myoclonic jerks.[7] HR at 12:20, 35:00 (testimony of the appellant). Also, in September 2020, over a year after submitting her May 6, 2019 application, her neurologist certified that her myoclonus and the associated symptoms are expected to continue for a year. IAF, Tab 15 at 24. Similarly, on the appellant's FMLA request, her LCSW certified that she would be unable to work from January 2018 through January 2019 due to her psychological conditions, which the appellant testified were still present as of the hearing in October 2020. *Id.* at 33; HR at 34:00 (testimony of the appellant). Thus, we find that the appellant has proven that her conditions are expected to last for at least 1 year from her application.

<u>We disagree with the administrative judge that the appellant failed to meet her burden to prove that accommodation of her conditions was unreasonable.</u>

¶41  On review, the appellant argues that the administrative judge erred in essentially finding that the appellant failed to establish that she could not be accommodated because she resigned before the reasonable accommodation process had been completed. PFR File, Tab 1 at 8-9; ID at 9-10. We agree with the appellant.

¶42  An appellant must establish that she cannot be accommodated in her current position and is not qualified for reassignment to a vacant position at the same

---

[7] The administrative judge questioned whether the appellant failed to renew her license or whether it was taken away by the state. ID at 12 & n.9. She suggested that if the appellant failed to renew it after it expired, her lack of a license was not caused by her medical conditions. *Id.* We are not persuaded that whether the appellant or the state initiated her license loss is relevant to whether she lost it due to her myoclonus. Therefore, we do not rely on this distinction here.

grade or level in which she could render useful and efficient service.[8] *Pettye v. Office of Personnel Management*, 83 M.S.P.R. 260, ¶ 6 (1999); 5 C.F.R. § 844.103(a)(4). "[A]ccommodation requires adjustments that allow an employee to continue to perform her official position." *Gooden v. Office of Personnel Management*, 471 F.3d 1275, 1279 (Fed. Cir. 2006) (citing, among other authorities, 5 C.F.R. § 844.102 ("Accommodation means a reasonable adjustment made to an employee's job or work environment that enables the employee to perform the duties of the position.")). The Federal Circuit has held that "a 'light-duty' assignment which does not involve the critical or essential elements of an employee's official position cannot be considered an 'accommodation.'" *Id*.

¶43    As discussed above, the appellant's position required significant driving. On February 26, 2018, the appellant's neurologist provided medical documentation in support of the appellant's request to work from home "due to limitations on driving for long periods of time." IAF, Tab 15 at 25. The appellant sought reasonable accommodation later that month, requesting full-time telework. IAF, Tab 18 at 4, 36. The agency did not offer the appellant reasonable accommodation while she was employed. IAF, Tab 4 at 79, Tab 18 at 36. On May 7, 2018, the appellant resigned, and therefore the agency closed her accommodation request file. IAF, Tab 4 at 74-46, Tab 18 at 36; HR at 42:00 (testimony of the appellant). However, on May 1, 2018, a labor relations specialist advised the appellant's supervisor that "the [reasonable accommodation request] in of itself seems almost improper since [the agency's equal employment opportunity] office has information about this employee *not being able to perform all the essential functions of her position*." IAF, Tab 18 at 113 (emphasis added).

---

[8] The agency did not offer the appellant reassignment. IAF, Tab 18 at 35. Therefore, we agree with the administrative judge she met to this element of her burden to prove eligibility for a disability retirement annuity. ID at 9-10; *Thorne*, 105 M.S.P.R. 171, ¶ 5.

¶44        When an agency certification that accommodation is unavailable is unrebutted and the record supports the conclusion that accommodation would not be possible, the Board has held that this criterion for obtaining disability retirement is met. *Chavez v. Office of Personnel Management*, 111 M.S.P.R. 69, ¶ 15 (2009).  Here, in describing the reasonable accommodation efforts made by the FDA, the appellant's supervisor observed, in essence, that the appellant's medical conditions prevented her from "perform[ing] the functions of her job as described in her position description."  IAF, Tab 18 at 34, 36.  Based on the FDA's unrebutted belief that the appellant could not be provided with a reasonable accommodation to perform her duties and the evidence of record that the appellant could not drive as required for her job, we find that the appellant met her burden to prove that she could not be reasonably accommodated in her position of record.

¶45        Accordingly, we REVERSE the administrative judge's initial decision and OPM's reconsideration decision.

**ORDER**

¶46        We ORDER OPM to award the appellant disability retirement.  OPM must complete this action no later than 20 days after the date of this decision.

¶47        We also ORDER OPM to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order.  We ORDER the appellant to provide all necessary information OPM requests to help it carry out the Board's Order.  The appellant, if not notified, should ask OPM about its progress.  *See* 5 C.F.R. § 1201.181(b).

¶48        No later than 30 days after OPM tells the appellant it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision on this appeal if the appellant believes that OPM did not fully carry out the Board's Order.  The petition should contain

specific reasons why the appellant believes OPM has not fully carried out the Board's Order, and should include the dates and results of any communications with OPM. *See* 5 C.F.R. § 1201.182(a).

¶49    This is the final decision of the Merit Systems Protection Board in this appeal. Title 5 of the Code of Federal Regulations, section 1201.113(c) (5 C.F.R. § 1201.113(c)).

### NOTICE OF APPEAL RIGHTS[9]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court

---

[9] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If you have a representative in this case, and your representative receives this decision before

you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) <u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[10]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

---

[10]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


FOR THE BOARD:                          /s/ for
                              Jennifer Everling
                              Acting Clerk of the Board

Washington, D.C.